IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MILDRED MACLIN,                     )
                                    )
          Plaintiff,                )
                                    )          Case No. 05 C 2517
     v.                             )
                                    )
SBC-AMERITECH,                      )
                                    )
          Defendant.                )

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Judge:

Plaintiff Mildred Denise Maclin filed the present two-count Complaint against her

employer SBC-Ameritech (now d/b/a "AT&T") alleging violations of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and race and gender discrimination in

violation of Title VII, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981. Before the Court are the

parties' Cross-Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure

56(c). For the following reasons, the Court grants Defendant's summary judgment motion and

denies Plaintiff's motion.

## BACKGROUND

### I.     Northern District of Illinois Local Rules

Both parties have brought motions to strike portions of each other's Northern District of

Illinois Local Rule 56.1(a) statements. Accordingly, the Court reviews Local Rule 56.1 before

turning to the relevant facts of this matter. When determining summary judgment motions, the

Court derives the background facts from the parties' Local Rule 56.1 statements. Local Rule

56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and

demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000).

Moreover, the local rules provide the parties with specific details as to how litigants in the Northern District of Illinois should approach summary judgment motions and responses. Specifically, Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Ammons v. Aramark Uniform Services, Inc.,* 368 F.3d 809, 817 (7th Cir. 2004). Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.,* 403 F.3d 940, 944 (7th Cir. 2005). The parties' statements must contain short numbered paragraphs including references to the affidavits, parts of the record, and other supporting materials. *See id.; Ammons,* 368 F.3d at 817.

The types of evidentiary material available to support Local Rule 56.1 Statements are numerous, but the most common materials include affidavits, deposition transcripts, and business documents. *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Under Federal Rule of Civil Procedure 56(e), supporting and opposing affidavits must show that the affiant is competent to testify to the matters at hand, and the affidavit must contain facts that would be admissible into evidence. *Markel v. Board of Regents of the Univ. of Wis.*, 276 F.3d 906, 912 (7th Cir. 2002); *see also Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir. 1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial").

A litigant's failure to respond to a Local Rule 56.1 Statement results in the Court

admitting the uncontroverted statements as true. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 608 (7th Cir. 2006). Further, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon,* 233 F.3d at 528; *see also Leibforth v. Belvidere Nat'l Bank*, 337 F.3d 931, 934 n.1 (7th Cir. 2003) (generalized denials do not satisfy Local Rule 56.1). In other words, the Court is not required to "wade through improper denials and legal argument in search of a genuinely disputed fact." *Bordelon,* 233 F.3d at 529. Finally, the Court may disregard statements and responses that do not properly cite to the record. *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997); *see also Cichon v. Exelon Generation Co., L.L.C.* 401 F.3d 803, 809-10 (7th Cir. 2005) ("district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed.").

With these principles in mind, the Court turns to the relevant facts of this case.

## II.    Relevant Facts Involving Maclin's Title VII/Section 1981 Claims

### A.    Maclin's Employment with AT&T

In December 1994, AT&T hired Maclin as a contract employee and in October 1995, Maclin became a full-time operations manager. (R. 72-1, Def.'s Stmt. Facts ¶ 5; R. 61-1, Pl.'s Stmt Facts ¶ 5.) In June 2000, Maclin became a Systems Engineer. (Pl.'s Stmt. Facts ¶ 8.) AT&T promoted Maclin from Systems Engineer to Area Manager in June 2001. (Def.'s Stmt. Facts ¶ 6.) Maclin's duties as Area Manager included managing building engineers, supporting the State of Illinois account, and managing traditional engineers, among other tasks. (Pl.'s Stmt. Facts ¶ 10.) As a result of her promotion, Maclin's salary increased – she went from an SG5

salary grade to a higher salary grade of SG6. (Def.'s Stmt. Facts ¶ 6.) During the time Maclin held the Area Manager position, AT&T changed the "salary grade" system to a "market zone" system and Maclin was placed in the "MT" market zone. (*Id*.; Pl.'s Stmt. Facts ¶¶ 11-12.) Market zones are groupings of jobs with similar market values, levels of responsibilities, and managerial functions. (Def.'s Stmt. Facts ¶ 7; Pl.'s Stmt. Facts ¶ 11.) In addition, jobs within market zones have similar target salary ranges and are used to identify Team Award target percentages associated with that grouping of jobs. (Def.'s Stmt. Facts ¶ 7.) "MT" is the name of the market zone for the second-level management position with a Team Award target percentage of 13% of the employee's base salary and/or disability benefit. (*Id*.)

For business reasons, AT&T was forced to lay off some employees in 2002, and in lieu of a layoff, Maclin chose a demotion from Area Manager to Implementation Engineer, which became effective in February 2003. (*Id.* ¶ 8; Pl.'s Stmt. Facts ¶ 14.) As an Implementation Engineer, Maclin began an implementation group in the Midwest by researching what other Implementation Engineers were doing in St. Louis and California and then implementing those functions. (Pl.'s Stmt. Facts ¶ 14.) Maclin's new position of Implementation Engineer was in the "MU" market zone, which is a first-level management position with a Team Award target percentage of 11% of the employee's base salary and/or disability benefit. (Def.'s Stmt. Facts ¶ 9.)

## B.     Bid Central

It is undisputed that starting in July 2003, Maclin assisted with the start-up of the Implementation Engineering ("IE") group, also known as Bid Central, although the parties dispute what role Maclin had in starting and working on this project. (Pl.'s Stmt. Facts ¶¶ 19-21;

R.77-1, Def.'s Resp. Pl.'s Stmt. Facts ¶¶ 19-21.) Furthermore, it is undisputed that in September 2003, Maclin began obtaining upper management's approval for four new hires. (Pl.'s Stmt. Facts ¶ 23.) The Bid Central staff included Complex Bid Managers, one of whom would serve as Team Lead. (Def.'s Stmt. Facts ¶ 12; Ex. F., Gregory Decl. ¶ 4.) The Complex Bid Manager's main responsibility was to review and assist the Sales Team in quoting complex sales proposals. (*Id*. ¶ 13.)

In October 2003, Bruce Gregory, a white male, was assigned the position of Associate Director of Bid Central and became Maclin's supervisor. (Pl.'s Stmt. Facts ¶ 31.) Gregory assigned Maclin to the Team Lead role. (Def.'s Stmt. Facts ¶ 14.) The Bid Managers and Team Lead were in the lower level "MU" market zone, not the upper management "MT" market zone. (Def.'s Stmt. Facts. ¶ 12.) Specifically, while working in Bid Central in the fall of 2003, upper management did not place Maclin in the "MT" market zone – she remained in the "MU" market zone. (*Id.* ¶ 15.) Instead, Maclin's supervisor, Gregory, as Associate Director of Bid Central, held the MT market zone management position during the relevant time period. (*Id*. ¶ 28.)

On Maclin's performance evaluation for the year of 2003, Rob Klein, Maclin's supervisor before Gregory, commented:

> [F]or the time that Denise Maclin worked for me, she showed herself to be a self-motivated individual that worked for the betterment of SBC. Denise was tasked with creating an IE group for the Midwest region that emulated the established group in St. Louis. The responsibility for the IE group to also do quotes was added to her responsibility in an effort to streamline the Avvid quoting process in the Midwest group. The intent was that the IE's that quoted a project would also be the ones to support the project after the sale. The quoting function eventually evolved into Bid Central.

(*Id.* ¶ 24.) In the fall of 2003, Maclin's job duties as Team Lead included approving time sheets, conducting performance evaluations, responding to payroll issues, and working with the

Complex Bid Managers to ensure compliance with internal deadlines, approving expenses, and assigning bids.  (Pl.s' Stmt. Facts ¶ 26.)

In both October 2003 and December 2003, Maclin was involved in automobile accidents. (Pl.s' Stmt. Facts ¶ 32; Def.'s Stmt. Facts ¶ 18; R. 90-1, Pl.'s Stmt. Add'l Facts ¶ 15.)  Maclin sustained injuries in the December 2003 automobile accident and, consequently, started a leave of absence on December 17, 2003.  (Def.'s Stmt. Facts ¶ 19; Pl.'s Stmt. Add'l Facts ¶ 15.)  At that time, Gregory did not know when she would return to work.  (Def.'s Stmt. Facts ¶ 19.) While Maclin was on her leave of absence, Gregory appointed Dave Gentilini, a white male, as interim Team Lead.  (Pl.'s Stmt. Facts ¶ 55.)

On or about April 22, 2004, Gregory discussed his intention to keep Gentilini in the position of Team Lead after Maclin returned from her leave of absence with Human Resources Manager Lori Minnis.  (Def.'s Stmt. Facts ¶ 24.)  After Gregory assigned Gentilini to the Team Lead role, Gentilini's salary and Team Award bonus potential did not increase – he remained in the "MU" market zone.  (*Id.* ¶ 61.)[1]  Gregory believed that Gentilini had performed well in the position of interim Team Lead.  (*Id.* ¶ 23.)  Meanwhile, during Maclin's leave of absence, Gregory changed the nature of the Team Lead role.  (*Id.* ¶ 64.)[2]  More specifically, the Team Lead no longer had direct reports or supervisory duties, such as approving expenses.  (*Id.*)  In

---

[1]  Maclin's responses to Defendant's statements in paragraphs 61 and 23 are non-responsive and fail to cite the record, therefore, the Court admits these statements.  *See Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 528-29 (7th Cir. 2000); *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997).

[2]  Maclin's denial of Defendant's statement in paragraph 64 is non-responsive, and thus the Court admits Defendant's statement.  *See Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528-29 (7th Cir. 2000).

fact, at her deposition, Maclin testified that as Team Lead, Gentilini did not have the same duties that she had in the fall of 2003 prior to going on her leave of absence because he did not have any people reporting to him. (Def.'s Ex. E, Maclin Dep. at 280.)

On May 11, 2004, Maclin returned to work on a reduced work schedule that lasted until June 7, 2004. (*Id.* ¶ 26.) Maclin worked no more than four hours per day from May 11, 2004 to May 24, 2004 and no more than six hours per day from May 25, 2004 to June 7, 2004. (*Id.*) Maclin returned to work full-time on June 8, 2004. (*Id.*) When Maclin returned from her leave of absence, upper management assigned her to the Complex Bid Manager position without the Team Lead role. (*Id.* ¶ 27; Pl.'s Stmt. Facts ¶ 63.)

### III. Relevant Facts Concerning Maclin's ADA Claims

#### A. Request to Transfer

Maclin resides on the South Side of Chicago and her assigned office location during the relevant time period was in Arlington Heights, Illinois. (Def.'s Stmt. Facts ¶ 32.) In October 2003, Maclin asked Gregory if she could work from home or from AT&T's downtown office, although she did not state any medical basis for her request. (*Id.* ¶ 33.) Because Gregory and Anthony Stamper, the Regional Vice-President of Implementation, wanted as many team members as possible to be located at Arlington Heights office, Gregory denied Maclin's request. (*Id.* ¶ 34.)[3] After Maclin returned from her December 17, 2003 through May 10, 2004 leave of absence, she sent an email to Gregory on August 3, 2004 asking if she could work at AT&T's downtown office. (*Id.* ¶ 35.) Again, Maclin gave no medical basis for this request and Gregory

---

[3] Maclin's denial of Defendant's statement in paragraph 34 is non-responsive, and thus Defendant's statement is deemed admitted. *See Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528-29 (7th Cir. 2000).

denied the request.  (*Id.* ¶ 35-36.)  On August 12, 2004, Maclin sent an email to Gregory and Stamper requesting to relocate and stated that the reason for her request was for "quality of life as well as exceeding in my job performance."  (*Id.* ¶ 37.)  Again, Maclin did not mention any medical issue as a reason for her request.  (*Id.*)  On August 16, 2004, Stamper denied this request, stating that group's strategy was to have the core team and any new hires work from the Arlington Heights office.  (*Id.* ¶ 38.)

On August 17, 2004, Maclin requested a meeting with Stamper and Human Resources personnel to discuss whether she could work from AT&T's downtown office.  (*Id.*)  On August 20, 2004, Maclin met with Stamper and Chris Lintner of Human Resources where she explained – for the first time – that she needed a shorter commute due to medical reasons.  (*Id.* ¶ 39.) Stamper and Human Resources both advised Maclin that she should contact AT&T's outsourced resource group, SMAART, regarding her request for an accommodation.  (*Id.*)

In November 2005, over a year after Human Resources and Stamper advised Maclin to speak with the resource group SMAART, Maclin's social worker sent a note to SMAART requesting a transfer to the downtown office because Maclin was having "black outs" while driving.  (*Id.* ¶ 43.)  The social worker's note stated that it would be in the best interest of Maclin and AT&T if they reduced the risk of her driving to work, and thus Maclin should be given consideration for accommodation by relocating her to a location near her home.  (*Id.*)  SMAART evaluated Maclin's claim and determined that Maclin's request fell outside of the accommodation process.  (*Id.* ¶ 44.)

SMAART then referred the matter to Carla Putman, the Associate Director for Job Accommodation at AT&T.  (*Id.* ¶ 45.)  Putman worked with Maclin, Gregory, and Human

Resources to determine whether relocation to the downtown office could still be accomplished. (*Id.*) In December 2005, AT&T granted Maclin's request to work from AT&T's downtown office, where she continues to work to this day. (*Id.*)

**B.      Maclin's Back Pain & Depression**

At her deposition, Maclin testified that during her leave of absence from December 2003 to May 2004, there was nothing that she wanted to do that she was unable to do. (*Id.* ¶ 50, Ex. A. Maclin Dep., at 139.)[4] During this time period, for instance, Maclin drove her children to school and drove her family members out to eat. (*Id.*) She also testified that she went to casinos in Indiana, as well as shopped at local stores. (*Id.*)

With respect to Maclin's back pain, Maclin testified that it did not substantially limit her ability to work and that her job was "simple" and "easy," and she could perform it. (*Id.* ¶ 51.) Maclin also testified that none of the duties of Team Lead or Complex Bid Manager required an employee to drive or lift equipment. (*Id.*) Meanwhile, Maclin completed a social security disability benefits questionnaire in April 2004 on which she did not list any problems with standing, moving, walking, or balancing. (*Id.* ¶ 52.) In her questionnaire, however, Maclin stated that she was unable to lift heavy objects, bowl, and play tennis. (*Id.* ¶ 53.)

Furthermore, Maclin testified that at one time, her depression limited her ability to multi-task, shop, pay bills, and take responsibility, but that she is now able to perform these tasks. (*Id.* ¶ 54; Ex. E, Maclin Dep. at 234-37.) She further testified that she can perform the requirements of her job, although she does her job one task at a time. (*Id.*, Maclin Dep. at 235-36.) Finally,

---

[4] Although Maclin denies Defendant's statement in paragraph 50, she testified as such, and thus her denial is baseless and deemed admitted.

Maclin testified that no one at AT&T considered her substantially limited in any major life activity, and she could not identify anyone at AT&T who treated her as disabled. (*Id.* ¶ 55.)

## IV.    Maclin's Claims

On April 27, 2005, Maclin filed the present Complaint, alleging that AT&T discriminated against her based on her disabilities of depression and back pain, race (African-American), and gender (female). (Def.'s Stmt. Facts ¶ 2.) First, Maclin contends that AT&T discriminated against her based on her disability by failing to provide a reasonable accommodation. (*Id.*) Next, Maclin alleges that AT&T discriminated against her based on her disability, race, and gender by demoting her when she returned from her leave of absence. (*Id.* ¶ 3.) Last, Maclin alleges that AT&T discriminated against her based on her race, disability, and gender because she got a smaller pay raise and bonus than a white, male co-worker in 2003-04. (*Id.* ¶ 4.)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). On cross-motions for summary judgment, the Court construes

the facts and reasonable inferences in favor of the party against whom the motion under consideration is made.  *Schneider v. Sentry Group Long Term Disability Plan,* 422 F.3d 621, 626 (7th Cir. 2005).  "[W]hen a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Anderson v. Liberty Lobby*, 477 U.S. at 255 (quoting Fed R. Civ. P. 56(e)).

## ANALYSIS

I.     **ADA Claims**

   A.     **Reasonable Accommodation**

   "The ADA prohibits discrimination against 'a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'"  *Burnett v. LFW Inc.,* 472 F.3d 471, 483 (7th Cir. 2006) (quoting 42 U.S.C. § 12112(a)).  "In addition to prohibiting adverse employment actions against disabled persons because of their disabilities, the ADA requires employers to make reasonable accommodations for the disabilities of qualified individuals."  *Timmons v. General Motors Corp.,* 469 F.3d 1122, 1125 (7th Cir. 2006) (citing 42 U.S.C. § 12112(b)(5)(A)).  To establish a failure to accommodate claim, a plaintiff must offer evidence that she has a disability within the meaning of the ADA, otherwise there would be nothing for the employer to accommodate.  *See Anders v. Waste Mgmt. of Wis.,* 463 F.3d 670, 677 (7th Cir. 2006).  In fact, the central question in both Maclin's ADA discrimination and failure to accommodate claims is whether Maclin is disabled for purposes of the ADA.  *See Cassimy v. Board of Educ. of Rockford Pub. Sch., Dist.,* 461 F.3d 932, 935-36 (7th Cir. 2006).  Thus, the Court first addresses

this inquiry.

When deciding whether a person is disabled under the ADA, the Court considers "the nature and severity of the impairment, the duration and expected duration of the impairment, and the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment." *Kampmier v. Emeritus Corp.,* 472 F.3d 930, 937 (7th Cir. 2007) (quoting 29 C.F.R. § 1630.2(j)(2)(I)-(iii)). Maclin can establish that she is disabled within the meaning of the ADA by presenting evidence that: (1) she has a physical or mental impairment that substantially limits one or more major life activities; (2) there is a record of such an impairment; or (3) her employer regards her as having such an impairment. *Id.* (citing 42 U.S.C.

§ 12102(2)(A)).

Viewing the evidence and all reasonable inferences in a light most favorable to Maclin, she has failed to establish a genuine issue of material fact under any of these three options. *See Anderson v. Liberty Lobby*, 477 U.S. at 255 (once properly supported motion for summary judgment is made, adverse party must set forth facts showing genuine issue of material fact for trial). First, Maclin admits that no one at AT&T considered her substantially limited in any major life activity, and she could not identify anyone at AT&T who treated her as disabled. (Def.'s Stmt. Facts ¶ 55.) Second, Maclin does not point to any evidence in the record to support the second option under Section 12102(2)(A). Most importantly, Maclin has not presented evidence creating a genuine issue of material fact that she has a physical or mental impairment that substantially limits one or more major life activities. *See Kampmier,* 472 F.3d at 937.

The focal point of the Court's inquiry involves the term "major life activities," which include activities that "are of central importance to daily life," such as "walking, seeing, and

12

hearing." Cassimy, 461 F.3d at 936 (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 197, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)).  Moreover, to qualify as disabled under the ADA, a plaintiff must show that the limitation on the "major life activity" is "substantial." *Toyota Motor Mfg.,* 534 U.S. at 195 (citing 42 U.S.C. § 12102(2)(A)).  "Substantially limits" means that the plaintiff "is unable to perform a major life activity that the average person in the general population can perform or is significantly restricted as to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Kampmier,* 472 F.3d at 937; *see also* 29 C.F.R. § 1630.2(j)(1)(I)-(ii).  As the Seventh Circuit recently articulated, "[n]ot every medical affliction amounts to, or gives rise to, a substantial limitation on a major life activity." *Cassimy,* 461 F.3d at 936.

Here, Maclin admitted at her deposition that during her leave of absence there was nothing that she wanted to do that she was unable to do.  (Def.'s Stmt. Facts ¶ 50, Ex. A. Maclin Dep., at 139.)  Maclin explained that she drove her children to school and drove her family members out to eat.  (*Id.*)  She also testified that she went to casinos in Indiana, as well as shopped at local stores.  (*Id.*)  As far as the major life activity of working, Maclin testified that her back pain did not substantially limit her ability to work, that her job was "simple" and "easy," and that she could perform it.  (*Id.* ¶ 51.)  Although Maclin stated in her April 2004 social security disability benefits questionnaire that she was unable to lift heavy objects, Maclin testified that none of the duties of Team Lead and Complex Bid Manager required an employee to drive or lift equipment.  (*Id.* ¶¶ 51, 53.)  Meanwhile, Maclin testified that she had no problems with standing, moving, walking, or balancing.  (*Id.* ¶ 52.)

In addition, Maclin testified that during her leave of absence, her depression limited her

13

ability to multi-task, shop, pay bills, and take responsibility, but that she can now perform these tasks. (*Id.* ¶ 54; Ex. E, Maclin Dep. at 234-37.) She specifically testified that she can perform the requirements of her job, although she does her job one task at a time. (*Id.*, Maclin Dep. at 235-36.)

In sum, Maclin's own testimony leaves no doubt that she is able to perform the tasks central to most people's lives. *See Kampmier,* 472 F.3d at 937. In other words, the evidence Maclin presents does not give rise to a genuine issue of material fact on the question of whether her depression and back pain substantially limited any major life activity, including the major life activity of working.[5] *See Cassimy,* 461 F.3d at 936; *Burnett,* 472 F.3d at 484. Thus, Maclin is not "disabled" within the meaning of the ADA.

Finally, the Court notes that AT&T granted Maclin's request to work at AT&T's downtown office, where she still works today. (Def.'s Stmt. Facts ¶ 45.) Further, evidence in the record reveals that when Maclin returned to work in May 2004 after her leave of absence, AT&T provided her with various accommodations, including frequent breaks to stretch and time off for physical therapy because she could not sit for long periods of time or do heavy lifting. (*Id.* ¶¶ 47-48.)

B.     **Discrimination/Disparate Treatment Claim**

---

[5] Although Maclin contends that she is limited in the major life activity of sitting, she does not develop this argument or submit sufficient evidence to create a genuine issue of material fact on the issue of substantial limitation. *See Burks v. Wisconsin Dept. of Transp.,* 464 F.3d 744, 756 (7th Cir. 2006). Put differently, Maclin's vague argument about sitting "unaccompanied by any evidence that [her] described afflictions were any worse than is suffered by many adults" must fail. *Id.* (citation omitted).

Maclin also claims that AT&T discriminated against her based on her disability. To establish a prima facie case of disability discrimination, Maclin must present evidence that: (1) she is disabled within the meaning of the ADA; (2) she was meeting AT&T's legitimate job expectations; (3) she suffered an adverse employment action; and (4) AT&T treated similarly situated employees outside of her protected class more favorably than she. *See Kampmier,* 472 F.3d at 937. Because Maclin is not disabled within the meaning of the ADA – as required under the first prima facie element – her ADA discrimination claim also fails. *See Cassimy*, 461 F.3d at 935-36.

## II.    Race & Gender Discrimination Claims

Maclin also asserts that AT&T discriminated against her based on her race and gender. Under Title VII,[6] Maclin may prove intentional discrimination by either the direct or indirect method of proof as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *See Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). Under the direct method, Maclin must establish that the motivation behind AT&T's alleged adverse employment actions were due to her race or gender. *See id.* "A plaintiff may prove discrimination using the direct method by establishing either an acknowledgment of discriminatory intent or circumstantial evidence that provides the basis for an inference of intentional discrimination." *Kampmier,* 472 F.3d at 939. Put differently, direct evidence of discrimination would amount to AT&T's admission that it took adverse employment actions against Maclin based on her race or gender. *See Raymond*, 442 F.3d at 610.

---

[6] Because the same prima facie standards apply to both Title VII and Section 1981 claims, the Court need not distinguish between the two statutes in its analysis. *See Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 403 (7th Cir. 2007).

Because Maclin does not present direct evidence of race or gender discrimination, the Court reviews her claims under the *McDonnell-Douglas* indirect method of proof. Under this method, Maclin must first establish a prima facie case of intentional discrimination by showing that: (1) she is a member of a protected class; (2) she reasonably performed to AT&T's legitimate job expectations; (3) AT&T took a materially adverse employment action against her; and (4) AT&T treated her differently than similarly situated employees outside of her protected classes. *See McDonnell Douglas*, 411 U.S. at 802; *Raymond*, 442 F.3d at 610. Failure to satisfy any of the prima facie elements is fatal to an employee's discrimination claim. *See Roney v. Illinois Dept. of Transp.,* 474 F.3d 455, 459 (7th Cir. 2007).

If Maclin establishes a prima facie case of discrimination, the burden of production shifts to AT&T to articulate a legitimate, nondiscriminatory reason for its actions. *See McDonnell Douglas*, 411 U.S. at 802; *Raymond*, 442 F.3d at 610. If AT&T meets this burden, Maclin must then show that AT&T's proffered explanation is pretext for discrimination. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981); *Raymond*, 442 F.3d at 610. The ultimate burden of persuasion, however, always remains with Maclin. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517-18, 113 S. Ct. 2742, 125 L.Ed.2d 407 (1993); *Raymond*, 442 F.3d at 610.

### A.    Demotion Claim

Maclin first contends that AT&T discriminated against her based on her "demotion" in May 2004. The Court turns to the third prima facie element – whether AT&T took an adverse employment action against Maclin, specifically, whether AT&T demoted Maclin – because it is dispositive.

Not everything that makes an employee unhappy is an adverse employment action. *Cullom v. Brown,* 209 F.3d 1035, 1041 (7th Cir. 2000). Instead, for an employment action to be adverse, it must be materially adverse, that is, more than a mere inconvenience or alteration of job responsibilities. *Id.*; *see also Timmons*, 469 F.3d at 1128. Although a "demotion is a paradigm adverse employment action," Maclin must set forth evidence that AT&T actually demoted her. *Ajayi v. Aramark Bus. Serv., Inc.,* 336 F.3d 520, 531 (7th Cir. 2003). A demotion may be "evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Timmons,* 469 F.3d at 1128 (quoting *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d132, 136 (7th Cir. 1993)). As *Timmons* further instructs, the Court's inquiry into whether AT&T demoted Maclin is contextual. *Id.*

Viewing the evidence and all reasonable inferences in a light most favorable to Maclin, evidence in the record reveals that when Gregory assigned Maclin to Team Lead in the fall of 2003, she remained in the "MU" market zone. In fact, Maclin admits at her deposition that when she worked in Bid Central, she did not get a salary or bonus increase nor did she see any paperwork related to her "promotion." (Def.'s Ex. E, Maclin Dep. at 82-83.) Further evidence indicates that when Maclin returned from her leave of absence in May 2004, AT&T did not decrease her wages, salary, or benefits. In other words, Maclin remained in the "MU" market zone.

Nonetheless, Maclin contends that she was demoted when she returned from her leave of absence because she previously held the title of Area Manager, not Complex Bid Manager. AT&T sets forth unrebutted evidence, however, that prior to her leave of absence starting in

December 2003, Maclin's title was Team Lead and that Maclin's use of the title "Area Manager" was a "vanity title." (Def.'s Stmt. Facts ¶ 66.)[7] Indeed, other AT&T employees used vanity titles although these were not their official AT&T job titles. (*Id.*; Def.'s Ex. I, Minnis Dep. at 39-40.)

Furthermore, undisputed evidence in the record reveals that although Maclin would have fewer job responsibilities as Complex Bid Manager than she had as Team Lead in December 2003, the job duties of the Team Lead position had changed during Maclin's leave of absence. Specifically, the Team Lead position had fewer responsibilities because there were no supervisory duties. In fact, at her deposition, Maclin admitted that as Team Lead, Gentilini did not have the same duties that she had in the fall of 2003. (R. 78-1, Def.'s Stmt. Add'l Facts ¶ 18; Def.'s Ex. E, Maclin Dep. at 280.) As such, the majority of responsibilities Maclin held in December 2003 no longer existed at the Team Lead or Complex Bid Manager level when she returned from her leave of absence in May 2004.

Accordingly, viewing the facts in the context of Maclin's job duties, official title, salary, and benefits – in tandem with the change of the Team Lead's responsibilities – Maclin did not suffer a materially adverse employment action when she returned to work after her leave of absence. *See Cullom,* 209 F.3d at 1041 ("adversity of an employment action is judge objectively"); *see also Moser v. Indiana Dept. of Corr.*, 406 F.3d 895, 904 (7th Cir. 2005) ("subjective preference for the former position, without more, does not demonstrate an adverse employment action"). In other words, Maclin has failed to set forth evidence creating a genuine

---

[7] Maclin's response to Defendant's statement in paragraph 66 is non-responsive, and thus the Court admits this statement. *See Bordelon v. Chi. Sch. Reform Bd. of Trs.,* 233 F.3d 524, 528-29 (7th Cir. 2000).

issue of fact that she suffered material harm when she returned from her leave of absence.  *See Traylor v. Brown,* 295 F.3d 783, 788 (7th Cir. 2002).  Because Maclin's failure to satisfy this prima facie element is fatal to her "demotion" claim, *see Roney*, 474 F.3d at 459, the Court need not address the parties' pretext arguments.

**B.      Raise/Bonus Claim**

Maclin also contends that AT&T discriminated against her because Gentilini received higher bonuses and pay increases than Maclin in 2003-04.  The majority of Maclin's argument in her opening brief consists of the following:

> It is undisputed that Gentilini received higher bonuses than Maclin for the 2003 [sic] and subsequent years.  Gentilini received a bonus of 3.9 % in comparison to Maclin's bonus of 1.5%.  In addition, Gentilini received an additional cash bonus under the Company Individual Discretionary Award guidelines which reserves such awards for outstanding performance.  Gentilini received similar favorable treatment for the 2004 calendar year.  SBC has offered no explanation for the more favorable treatment.  Gentilni [sic] did not begin working for Bid Central until October 2003 at which time he reported to Maclin.

(R. 60-1, Pl.'s Mem. Supp. Mot. Summ J., at 11-12.)  In her argument, Maclin does not cite to the record or any legal authority.  Indeed, Maclin's argument is factually inaccurate and incomplete.

In any event, the Seventh Circuit has held that although the denial of a raise qualifies as an adverse employment action, the denial of a bonus does not.  *Farrell v. Butler Univ.,* 421 F.3d 609, 614 (7th Cir. 2005); *Hottenroth v. Village of Slinger,* 388 F.3d 1015, 1030 (7th Cir. 2004).  The Seventh Circuit distinguishes bonuses from raises because "bonuses generally are sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer," while "[r]aises are the norm for workers who perform satisfactorily."  *Farrell,* 421 F.3d at 614 (citation

omitted). Thus, Maclin's claim based on the amount of her bonus in relation to Gentilini's bonuses is not actionable under Title VII. *See id.*

Moreover, although Maclin states that AT&T discriminated against her based on her lower pay increase in a heading in her opening brief, she makes her argument concerning her pay raise for the first time in her reply brief. In it well-settled that "[a]rguments that first appear in a reply brief are deemed waived." *Hart v. Transit Mgmt. of Racine, Inc.*, 426 F.3d 863, 867 (7th Cir. 2005) (per curiam). Even if the Court were to consider this claim, it fails because Maclin's argument focuses on her own perceptions that her job performance exceeded Gentilini's job performance. *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) ("plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reasons for its employment actions.") (citation omitted). Simply put, Maclin's perceptions about her job performance cannot create a genuine issue of material fact because "[a]n employee's perception of his own performance ... cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities." *Id.* (citation omitted). Therefore, Maclin's pay raise claim fails as a matter of law.

## **CONCLUSION**

For these reasons, the Court grants Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c) and denies Plaintiff's Rule 56(c) Motion for Summary Judgment. Because the Court addressed the parties' relevant Local Rule 56.1 arguments within this Memorandum, Opinion, and Order, the Court denies Defendant's Motion to Strike Portions of Plaintiff's Rule 56.1(a) Statement, Plaintiff's Motion to Strike Portions of Defendant's Rule 56.1(a) Statement, and Plaintiff's Motion to Strike Portions of the Gregory Affidavit as moot.

Dated: March 2, 2007

**ENTERED**

**AMY J. ST. EVE**

**United States District Judge**